UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

REGINALD GLEAVES,

                          Plaintiff,

      -v-

COMMISSIONER OF SOCIAL SECURITY,

                          Defendant.

CIVIL ACTION NO.: 19 Civ. 7279 (SLC)

**OPINION AND ORDER**

**SARAH L. CAVE,** United States Magistrate Judge.

## I.    INTRODUCTION

On August 2, 2019, Plaintiff Reginald Gleaves ("Gleaves") commenced this action pursuant to Section 205(g) of the Social Security Act (the "Act"), as amended at 42 U.S.C. § 405(g). He seeks review of the June 17, 2019 decision by the Commissioner (the "Commissioner") of the Social Security Administration ("SSA"), denying his application for Supplemental Security Income ("SSI") benefits under the Act (the "Decision"). (ECF No. 2 at 2). Gleaves contends that the Decision was "not supported by substantial evidence in the record, or was based on legal error." (Id.) Gleaves asks the Court, inter alia, to modify or reverse the Decision and grant him SSI benefits. (Id.)

On March 6, 2020, the Commissioner moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) (the "Motion"). (ECF Nos. 28–30). To date, despite the Court's prompting (see ECF No. 31), Gleaves has not responded to the Motion. Notwithstanding the lack of a response to the Motion, the Court has conducted a thorough review of the

Commissioner's arguments and the record.  For the reasons set forth below, the Motion is GRANTED.

## II.   BACKGROUND

### A. Procedural History

On May 16, 2016, Gleaves filed an application for SSI benefits, claiming that he had been unable to work since November 20, 2011 because of high blood pressure, high cholesterol, diabetes, congestive heart failure, hyperlipidemia, panic and anxiety attacks, migraine headaches, and bilateral foot pain.  (SSA Administrative Record (ECF No. 9) ("R.") at 85–88).  On August 18, 2016, the SSA denied Gleaves's application, finding that he was not disabled.  (R. 102–04).  On October 3, 2016, Gleaves filed a written request for a hearing before an Administrative Law Judge ("ALJ").  (R. 114–16).

On September 17, 2018, Gleaves appeared before ALJ William L. Hogan for an evidentiary hearing.  (R. 33–56).  On October 1, 2018, the ALJ found that Gleaves was not disabled under the Act (the "ALJ's Decision").  (R. 17–29).  On June 17, 2019, the SSA Appeals Council (the "Appeals Council") denied Gleaves's request for review of the ALJ's Decision.  (R. 1–5).

On August 2, 2019, after exhausting his administrative remedies, Gleaves filed a complaint in this Court (the "Complaint").  (ECF No. 2).  On March 6, 2020, the Commissioner filed the Motion (ECF Nos. 28–30), arguing that ALJ Hogan's decision applied the proper legal standards and was based on substantial evidence.  As noted above, Gleaves has not filed a response.

### B. Factual Background

#### 1. Non-medical evidence

Gleaves was born on August 1, 1964 and has his high school diploma.  (R. 29, 49).  He is a veteran of the United States Army, in which he served from 1984 to 1987.  (R. 143, 506).  He was last employed in 2006 for a few months as a custodian at a post office.  (R. 386).  He lives alone in an apartment, takes care of himself, does not need reminders to take his medication, prepares his own meals, and performs housework.  (R. 171–73).  He needs accompaniment when he leaves his apartment but leaves for appointments and shopping, takes public transportation, and handles his own money.  (R. 173–75).

#### 2. Medical evidence
##### a. Physical health

Since about 2012, Gleaves has been receiving treatment at the Veterans Affairs New York Harbor Healthcare Center ("VA") for various conditions, including obesity, hypertension, chest pain, diabetes, and congestive heart failure.  (R. 236–377).  Gleaves has experienced back pain since a motor vehicle accident that occurred when he was in his 20s.  (R. 379).  From 2014 through 2016, tests performed on Gleaves revealed a 55% left ejection fraction; no evidence of acute fracture to his feet; mild degenerative arthritis; mild degenerative changes at his L4-L5 and L5-S1; poorly controlled blood pressure; obesity; a hemoglobin A1C level of 10.5%; and normal lab results in October 2016.  (R. 254, 261, 317–18, 344, 439).  During that time, Gleaves reported back pain and discomfort when lifting heavy objects.  (R. 260).

In October 2016, Gleaves reported palpitations; chest tightness; shortness of breath around people in the subway; tingling in his fingers and legs; and tightness in his abdomen.

(R. 440).  The tingling was not enough to limit his activity.  (R. 440).  Gleaves had lost weight, his heart rate was normal, and his extremities did not have edema or erythema.  (R. 442).

In November 2016, Gleaves reported having panic attacks, palpitations, and shortness of breath when he was around people.  (R. 438).  In January 2017, Gleaves reported foot pain.  (R. 435).  A physical examination revealed that Gleaves had, inter alia, reduced sensation in his feet, a slow wide gait, metatarsalgia and hyperesthesia of his digits and feet, toes tender to palpation, and valgus calcaneus to six degrees.  (R. 436).  In June 2017, Gleaves complained of less frequent panic attacks and sciatic back pain; and though he was morbidly obese, his physical examination was normal, he had no active cardiac issues, and his hypertension was controlled.  (R. 424–26, 428–30).  Gleaves's chest pain was diagnosed as linked to his obesity, pulmonary disease, obstructive sleep apnea, and anxiety, not cardiac in nature.  (R. 426).  During an October 2017 appointment, Gleaves denied having chest pain and shortness of breath.  (R. 419–20).  Gleaves's physical examination showed that his motor and sensory functions were intact.  (R. 421).

In January 2018, Gleaves reported weakness in his right knee, pain in his right foot, and shortness of breath, but the results of his physical examination were mostly normal.  (R. 414–16).  In July 2018, Gleaves reported elongated nails, without numbness, pedal pain, tingling, or any other concerns.  (R. 408).  Gleaves's toenails were hypertrophic, dystrophic, and discolored, but his sensation was intact with 5/5 muscle strength.  (R. 408).

In September 2018, Gleaves's cardiologist, Dr. Robert Donning, completed a medical report stating that Gleaves did not have organ damage, chronic congestive heart failure,

myocardial infraction, or ischemic heart disease.  (R. 535–59).  Dr. Donning concluded that Gleaves's panic attacks did not have a cardiac origin but may limit his activity.  (R. 558).

 **b.**  <u>Psychotherapy and psychiatric treatment</u>

 On May 24, 2016, as a result of increasing anxiety symptoms, Gleaves began psychological treatment at the VA, receiving a consultation from William Somerville, M.A., who was supervised by Laura Schairer, Ph.D, and Joanna Dognin, Psy.D.  (R. 247–48).  Gleaves reported "experiencing [a] pounding heart, sweating, shortness of breath, chest pain, fear of losing control, and fear of dying" multiple times per day.  (R. 248).  These symptoms began in 2012, but had increased in frequency over the prior year.  (R. 248).  While denying agoraphobia symptoms, Gleaves noted that he tried to avoid crowds and would plan trips to the VA and laundromat at times when they would be less crowded.  (R. 248).  Gleaves was "tearful" during the session, and he "reported feeling hopeless most of the time."  (R. 248).  While Gleaves did not describe a loss of interest or pleasure in leisure activities, Somerville noted a "general paucity" of such activities in Gleaves's life. (R. 248).  Gleaves described feelings of "intense guilt" pertaining to his estranged nine-year-old daughter, "poor concentration," and recurring thoughts about death, noting that about ten close family members and friends had died in the preceding decade, including his mother.  (R. 248).  Gleaves lamented that there would be a small attendance at his funeral, but denied suicidal ideation.  (R. 248–49).  In his mental status evaluation, Gleaves was alert and oriented, well-groomed, spoke normally with coherent language, had a tearful affect "congruent [with his] mood and ideation," displayed unremarkable thought content and no delusions, evidenced good judgment and insight, had a "grossly intact" memory, and had an appropriate fund of knowledge for his educational background.  (R. 250).  Gleaves was initially diagnosed with panic disorder and

persistent depressive disorder, and was, <u>inter</u> <u>alia</u>, referred to "short-term individual psychotherapy." (R. 250–51).

On December 14, 2016, Gleaves had an initial appointment with clinical psychologist Neal Stuart Spivack, PhD. (R. 507). Gleaves complained of recurring chest pain that his cardiologist described as potentially stemming from panic attacks. (R. 507). He further complained of continued panic attacks that worsen in "crowded situations," which caused him to become irritable and avoid others. (R. 507). Gleaves described past traumatic experiences, and relayed that he had an irregular sleep schedule, often dreaming about his deceased mother. (R. 507). In his mental status evaluation, Gleaves was oriented and attentive; displayed poor grooming; spoke normally with normal language; and exhibited an anxious mood with congruent affect, logical and goal-directed thought processes, adequate insight and judgment, an average fund of knowledge, and no suicidal ideation. (R. 508–09). He was diagnosed with panic disorder with agoraphobia and persistent depressive disorder. (R. 509).

Gleaves saw Dr. Spivack again on December 19, 2016, and was "emotional," with a tendency to "over-react to emotional triggers." (R. 506). He described himself as being "always scared," and in an attempt to uncover the sources of this anxiety, Gleaves recounted episodes of racially-based harassment during his Army service. (R. 506). In his January 9, 2017 session, Gleaves "reported feeling more relaxed and calmer after having spent New Year's [Eve] with his family," and after beginning to smoke small amounts of marijuana. (R. 505). He discussed his "continued bereavement" of his mother. (R. 505). At a later session in January, after reporting side effects of increased paranoia and anxiety as a result of his marijuana use, Gleaves expressed interest in meeting a psychiatrist. (R. 504).

On February 7, 2017, Gleaves had an appointment with psychiatrist James Lubin, MD. (R. 500).  Gleaves described his panic attacks as consisting of "uncontrollable and intermittent palpitation, sweating, chest tightness[,] and feeling weak in the knees" for up to thirty minutes. (R. 500).  Gleaves also reported an "irritable mood, low frustration tolerances, some depressed mood[,] and difficultly being around people," symptoms that were reduced by smoking marijuana.  (R. 500).  In his mental status examination, Gleaves was cooperative, reasonable, and appropriately groomed; he displayed an anxious mood and congruent affect, normal and coherent thought processes, normal speech with intact language, good judgment and insight, intact memory, attention span, and concentration, an average fund of knowledge; and was alert and attentive.  (R. 503).  Dr. Lubin prescribed Zoloft and Hydroxyzine.  (R. 504).  At a later session with Dr. Spivack, Gleaves relayed that he was "pleased" with Dr. Lubin and was "willing to start medication."  (R. 498).

On February 28, 2017, Gleaves had a follow-up appointment with Dr. Lubin and reported that he had stopped taking Zoloft and Hydroxyzine — the former was "not working," and the latter "made [him] too sleepy" — and noted that smoking marijuana helped him.  (R. 499).  In his mental status examination, Gleaves was cooperative, pleasant, and made good eye contact; spoke normally; was in a "good" mood with an affect that was "euthymic, full, reactive," and "congruent to [his] mood and situation"; and had "logical, organized, coherent, [and] rational" thought processes with grossly intact cognition.  (R. 499).  After receiving more information regarding the medication, Gleaves was once again prescribed Zoloft.  (R. 499).  On March 6, 2017, Gleaves reported to Dr. Spivack that he was not taking Zoloft.  (R. 497).  After a discussion, Gleaves agreed to take the Zoloft as directed, but continued to use marijuana for his anxiety.  (R.

497).  Gleaves also reported fewer "automatic negative thoughts," which resulted in fewer panic symptoms.  (R. 497).

On March 13, 2017, Gleaves saw Dr. Spivack, and was in a "bright and interactive mood," reporting that his marijuana use aided him in managing his anxiety.  (R. 496).  He was also relieved to discover that his avoidance and irritability were not personality traits, but rather reactions to past traumatic experiences, notably his room being set on fire during his Army service.  (R. 496). Gleaves also discussed his Social Security case and more frequent leisure activities.  (R. 496).

On April 4, 2017, Gleaves met with Dr. Lubin, who replaced his Zoloft prescription with Wellbutrin.  (R. 495).  In his mental status examination, Gleaves displayed a cooperative and pleasant attitude with good eye contact; spoke normally; was in a good mood with a "euthymic, full, [and] reactive" affect; had "logical, organized, coherent, [and] rational" thought processes; exhibited fair insight and judgment; and had grossly intact cognition.  (R. 495).  On April 10, 2017, Gleaves saw Dr. Spivack, and reported progress in that he was able to take walks outside at crowded times, which typically would have made him feel anxious.  (R. 494).  Gleaves believed that the medication was having a positive effect, but noted that the results were not as immediate as compared to smoking marijuana.  (R. 494).  Gleaves had missed his prior appointment due to a consecutive string of "bad days," when he had increased anxiety, was lethargic, fearful that he would die, and fixated on the loss of his mother.  (R. 494).

In a follow-up appointment with Dr. Lubin on April 18, 2017, Gleaves appeared "psychiatrically stable," was in a good mood, and was excited that the Wellbutrin was working, along with his therapy sessions.  (R. 492).  In his mental status examination, Gleaves displayed a cooperative and pleasant attitude with good eye contact; spoke normally; was in a "good" mood

with a "euthymic, full, [and] reactive" affect; had "logical, organized, coherent, [and] rational" thought processes; exhibited fair insight and judgment; and had grossly intact cognition.  (R. 492).

On May 1, 2017, Gleaves saw Dr. Spivack, and reported feeling "weird" and not like himself, but still able to "travel in more crowded situations" without anxiety, "rarely wanting to isolate," and "less overwhelmed" when outside.  (R. 491).

On May 15, 2017, Gleaves reported feeling upset about Mother's Day, resulting in self-isolation.  (R. 490).  Gleaves attributed a continued "weird" feeling to his medication, and stopped taking it for two days, which Dr. Spivack counseled against.  (R. 490).  Gleaves also reported an increasing forgetfulness, which he feared was the result of dementia, but Dr. Spivack reassured him that it was more likely an effect of smoking marijuana.  (R. 490–91).

On June 5, 2017, Gleaves saw Dr. Spivack, and "reported felling increasingly anxious," which he attributed to an inability to smoke marijuana over the preceding week and a half due to financial issues.  (R. 488).  In the week prior to the appointment, Gleaves did not leave his apartment.  (R. 488).  While still not feeling like himself and attributing the sensation to his medication, Gleaves was aware and appreciative of the medication's positive effects.  (R. 488).  Gleaves noted a decline in forgetfulness and discussed the importance of regularly leaving his apartment.  (R. 488).

During Gleaves's June 12, 2017 appointment with Dr. Spivack, he reported feeling "back on track" because he was once again able to purchase marijuana, enabling him to reduce his anxiety and take daily walks.  (R. 487).  This increase in activity was also associated with a decrease in negative thought patterns.  (R. 487).

Gleaves's positive mood continued during his June 19, 2017 appointment with Dr. Spivack. (R. 486). While he had been having fewer "bad days," Gleaves spoke with Dr. Spivack about recently feeling "in the dumps" and a worsening mood spiral. (R. 486). Dr. Spivack suggested ways to arrest the negative spiral, including taking a shower and going for a walk, and the pair discussed Gleaves's social isolation. (R. 486).

On October 11, 2017, Gleaves saw Jeffrey A. Chang, MD for psychiatric evaluation and management. (R. 478). Gleaves reported being in an "OK" mood, and discussed his anxiety in crowded spaces or with large groups of people. (R. 478). Gleaves noted that he had "improved tremendously" through his psychotherapy sessions with Dr. Spivack. (R. 478). In his mental status examination, Gleaves was appropriately dressed; displayed a calm and cooperative attitude; spoke spontaneously with a regular rate and rhythm; was in a "good" mood with an apparent "euthymic, full range, reactive, appropriate, [and] stable" affect; had linear and goal-oriented thought processes; exhibited fair insight and judgment; was alert and oriented; and had a "grossly intact" memory, fair attention and concentration, and an average fund of knowledge. (R. 478–79). Dr. Chang continued Gleaves's prescription for Wellbutrin and re-started the prescription for Hydroxyzine. (R. 480).

On December 18, 2017, Gleaves saw Dr. Spivack, and noted that his prior symptoms had returned, causing him to self-isolate at home, feel anxious in crowded situations, and stop going on walks. (R. 477). Gleaves continued to use marijuana for his anxiety. (R. 477). Gleaves discussed a recent trip to visit family over Thanksgiving, which was "very successful and pleasurable," and while he smoked marijuana during the trip for his anxiety, he was "relatively comfortable." (R. 477). The pair also discussed positive habits that helped reduce Gleaves's

anxiety, such as daily exercise and visiting family.  (R. 477).  Gleaves planned to resume these habits, intended to restart biweekly therapy sessions, and return to see Dr. Chang.  (R. 477).

Gleaves again saw Dr. Spivack in January, April, June, and July 2018.  During these sessions Gleaves complained to Dr. Spivack of anxiety related to travel to his medical appointments and having run out of marijuana, but he did not appear to be a danger to himself or others.  (R. 476, 486).  Gleaves reported that the stopped taking walks because of the weather, was smoking more, and having negative thoughts about his childhood.  (R. 476, 486).  During the April 2018 appointment, Gleaves reported that he had been arrested for marijuana possession and showed signs of intoxication during the appointment, but was able to focus.  (R. 467).  During a June 2018 appointment, Gleaves reported anxiety about his Social Security case, low energy, and back pain.  (R. 465).  During a later June 2018 appointment, Gleaves reported having had a great week spending time with family.  (R. 464).

In September 2018, Dr. Spivack performed a psychiatric functional assessment on Gleaves, diagnosing him with a panic disorder with agoraphobia and persistent depressive disorder.  (R. 543–52).  Dr. Spivack found that Gleaves had some marked, some extreme, and some moderate limitations, but no limitations in distinguishing between acceptable and unacceptable work performance, setting goals, maintaining hygiene, acceptable for work, being aware of hazards, and taking appropriate precautions.  (R. 544–45).  Dr. Spivack opined that Gleaves would have to be absent or late from work more than four days per month.  (R. 546).  Dr. Spivack noted that Gleaves would have difficulty keeping a job, cooperating with co-workers, maintaining attention for two hours at a time, maintaining regular attendance and working without interruptions.  (R. 551).

### c.      Dr. Ram Ravi, SSA consulting physician

In July 2016, Dr. Ram Ravi performed an internal medicine consultative examination. (R. 379–83).  Gleaves reported, inter alia, sharp and constant back and foot pain, hypertension, congestive heart failure, diabetes, diabetic neuropathy, intermittent numbness in his hand and feet, headaches, and an abdominal hernia.  (R. 379–80).  He shared that he took care of himself, performed his domestic chores, and socialized with friends, but his pain limited his ability to do laundry and shop.  (R. 380).

Dr. Ravi found that Gleaves had no acute distress, a normal gait and stance, used no assistive devices, needed no help getting on and off the exam able, was able to rise from his chair without difficulty, could not walk on his heals or toes, could squat; examinations of his heart, chest and lungs were normal; did have an abdominal hernia; and noted his flexion and extension, but concluded that his tests were otherwise unremarkable, including full range of motion in his spine and joints.  (R. 381–82).  Dr. Ravi concluded that Gleaves had no limitations in standing or sitting, but mild limitations in bending, pushing, pulling, lifting, and carrying.  (R. 382–83).  In addition, because of his cardiac condition, Dr. Ravi recommended that Gleaves avoid activities requiring mild or greater exertion.  (R. 382–83).

### d.      Dr. Haruyo Fujiwaki, SSA consulting psychiatrist

In July 2016, Dr. Haruyo Fujiwaki performed a psychiatric evaluation on Gleaves.  (R. 386–89).  Gleaves reported no psychiatric hospitalizations.  (R. 386).  Gleaves reported dysphoric moods, loss of energy, irritability, social withdrawal, fear in crowded spaces and associated shortness of breath, frequent awakenings from sleep, short-term memory issues, difficulty concentrating, and forgetfulness, but denied suicidal or homicidal ideation or attempts.  (R. 386–

87).  Gleaves reported being able to take care of himself and socialize with friends, but his back pain kept him from doing laundry and shopping.  (R. 388).

Dr. Fujikawi found that Gleaves was cooperative with adequate social, concentration, speech, language, coherence, attention, and calculation skills.  (R. 387).  Gleaves's memory skills were slightly below average but his fund of information was appropriate, judgment fair, and he was able to learn new tasks and follow simple directions.  (R. 387–88).  Dr. Fujikawi concluded that Gleaves had some mild and mild-to-moderate limitations due to his mood instability.  (R. 388).

### e.    Dr. A. Chapman, SSA consulting psychologist

In August 2016, Dr. A. Chapman reviewed the record and concluded that Gleaves retained the ability to perform demands of unskilled work, understand and follow simple instructions, maintain concentration, use appropriate judgment, and respond to supervision, co-workers, and work situations.  (R. 96).

### f.    Dr. Silvia Aguiar, SSA consulting physician

In June 2018, Dr. Silvia Aguiar performed an internal medicine examination on Gleaves. (R. 391).  Gleaves complained of bone spurs on his heels, pain when walking, back pain, hypertension, diabetes, and congestive heart failure.  (R. 391).  Gleaves confirmed that he had not had any surgery, epidurals, physical therapy, or other pain management for the pain he was experiencing, and he was able to perform activities required for daily living, with help with his laundry and shopping.  (R. 391).

Dr. Aguiar found that Gleaves was in no acute distress, was able to squat, walk on his heels and toes, get on and off the exam table, and rise from his chair without struggle.  (R. 393).

Gleaves's examination was unremarkable with full range of motion in his spine and extremities, and no sensory deficits.  (R. 394).  Dr. Aguiar did note that Gleaves was in stage-two heart failure and should avoid moderate or greater exertion.  (R. 395).

### C. <u>Administrative Proceedings</u>

#### 1. <u>Hearing before the ALJ</u>

On September 17, 2018, ALJ Hogan conducted a hearing at which Gleaves was represented by non-attorney Betty Heaton ("Heaton") of Manhattan Legal Services.  (R. 11, 33–56; 136).  The proceeding was conducted by video, with Gleaves appearing in person in New York and ALJ Hogan presiding from Fargo, North Dakota.  (R. 36).  Vocational Expert Ja'Nitta Marbury ("Marbury") was also present.  (R. 36–37; <u>see</u> <u>also</u> R. 131–32; 202–20).

At the start of the proceeding, Heaton waived further reading of the issues in the case and did not object to the admission of the exhibits into evidence.  (R. 37).  ALJ Hogan confirmed that Gleaves was only applying for SSI benefits and the date of the onset of his symptoms was correctly listed as November 20, 2011, even though his application was dated May 16, 2016. (R. 37–38).

ALJ Hogan continued the proceeding by asking Gleaves about his professional and medical history, with Heaton interjecting with questions.  (R. 40–45).

ALJ Hogan asked Gleaves about his ability to hold a "very simple, unskilled job on a full-time basis," to which he replied that he would have issues traveling to and from work, because he gets "scared, nervous," "bust[s] out in sweats," and "get[s] headaches" when around people (R. 41).  Gleaves noted that his symptoms were diagnosed as anxiety and panic attacks.  (R. 41). Gleaves continued that in a "magical world," he could hold a job where he had no contact with

the general public, but only if he were able to lay down every two hours because he gets back pain if he sits or stands for an extended period.  (R. 41–42).  Gleaves noted that although no doctor ever told him that he needed to lie down every two hours, his pain would require him to do so and he was taking pain medication for his back.  (R. 44).

ALJ Hogan then questioned Gleaves about his employment history.  (R. 44).  Gleaves responded that while he had earned some money off the books by working "odd jobs" around the neighborhood, he primarily relied on public assistance.  (R. 44).

Heaton then questioned Gleaves about his physical and mental health.  (R. 45–50). Gleaves testified that pain in his back, right knee, feet, and hands prevented him from working. (R. 45–47).  Gleaves described his back pain as occurring when he sits or stands for long periods of time, or when he wakes up in the morning.  (R. 45).  The pain was described as being located in either his upper or lower back:  on top, the pain was "sharp," but on the bottom, it felt like his back would "lock[] up."  (R. 46).  Gleaves testified that to treat this pain, he would lay on his side or his stomach for approximately one hour.  (R. 46).

Gleaves noted that his right knee would occasionally "give[] out," and described pain in his feet and ankles, but did not remember his specific medical diagnosis.  (R. 46).  He also testified that his hands had been "cramp[ing] up a lot" as of late, which made it hard for him to hold or grab objects.  (R. 47).

Gleaves testified that he began seeing a psychiatrist when his cardiologist told him that the intermittent chest pain that he was experiencing might have a psychological cause.  (R. 47). He stated that he had been receiving mental health treatment for approximately one year, for "[a]nxiety attacks, panic attacks[,] and depression" that would happen when he would leave his

building.  (R. 47).  These attacks would occur on a near-daily basis, filling Gleaves with a "scary feeling" that "something bad [was] going to happen."  (R. 47–48).  During these attacks, Gleaves would "burst out into [a] sweat," develop headaches, have a tightening in his chest that made it difficult to breathe, and would experience racing thoughts.  (R. 48).

Gleaves testified that in his previous employment as a truck driver, he had a good relationship with his supervisor, because they did not frequently see each other.  (R. 48–49).  In general, Gleaves noted feeling "nervous," "jittery," and "scared" when interacting with others.  (R. 49).  Gleaves noted that his "ability to concentrate and focus" was "okay" while at home, but when outside of the home, he would have a "rough time . . . centering on one thing[.]"  (R. 49).  Gleaves testified to waking up "[t]hree or four times" during an average night but such disturbance "[did not] really bother [him]."  (R. 49–50).  Ultimately, Gleaves described "traveling" (i.e., commuting) as the main obstacle preventing him from working.  (R. 50).

Next, ALJ Hogan asked Vocational Expert Marbury to consider a hypothetical individual who had the same "age, education[,] and work experience" as Gleaves; who could

> occasionally lift or carry 20 pounds[;] frequently lift or carry 10 pounds[;] [s]tand or walk with normal breaks a total of about six hours in an eight-hour day[;] [who should] [a]void concentrated exposure to extreme cold, to extreme heat[,] and to hazards[;] [who] would retain the capacity to understand, remember[,] and carry out short, simple instructions[; who could] interact with supervisors, coworkers[,] and the general public occasionally, meaning up to one-third of the day[; and who could] respond appropriately to changes in a routine work setting and [could] make judgments  on simple work[-]related decisions.

(R. 51–52).

Marbury testified that this hypothetical individual could not perform Gleaves's past work as a custodian, a semi-skilled position with an SVP of three.  (R. 52).  However, this individual could find work as a "label remover" (DOT 920.687-106), a position with an SVP of two, light

physical demands, and 400,000 jobs nationally; a "vacuum bottle assembler" (DOT 739.687-194), a position with an SVP of one, light physical demands, and 200,000 jobs nationally; and a "small parts assembler" (DOT 706.684-022), a position with an SVP of two, light physical demands, and 200,000 jobs nationally. (R. 52). Marbury testified that these jobs would still be available even if the individual had "no interaction with the general public," only "brief and superficial" interaction with coworkers, and was unable to drive or squat. (R. 52–53).

ALJ Hogan then gave Marbury a new hypothetical, asking her to picture an individual with "marked" limitations in "[u]nderstand[ing] and remember[ing] short and simple instructions[;] [c]arry[ing] out very short and simple oral instructions, one to two step instructions[; and] [g]et[ting] along with coworkers or peers without unduly distracting them." (R. 53–54). This individual would also have "extreme" limitations in

> [u]s[ing] reason and judgment to make work[-]related decisions[;] [r]emember[ing] locations and work[-]like procedures[;] [s]equenc[ing] multistep activities[;] [c]omplet[ing] tasks in a timely manner[;] [m]aintain[ing] attention for two-hour segments[;] [s]ustain[ing] an ordinary routine without special supervision[;] [p]erform[ing] at a consistent pace, without interruption from symptoms or an unreasonable number and length of breaks[;] [r]espond[ing] appropriately to changes in a routine work setting[; and] deal[ing] with normal work stress.

(R. 54). ALJ Hogan also noted that this individual would be absent from work "more than four days per month." (R. 54). He asked Marbury if this individual could perform the aforementioned three positions, or "any other competitive employment" in the national economy, to which she replied in the negative. (R. 54).

Before the conclusion of the hearing, Heaton noted that Gleaves's limitations are "largely psychiatric" as detailed in his psychiatric record. (R. 55). ALJ Hogan noted that he had the same impression after his preliminary review of the record, so his main objective was to discern

whether Gleaves's marked and extreme limitations were supported by his treatment notes. (R. 55–56).

### 2. The ALJ's decision

On October 1, 2018, ALJ Hogan issued his decision denying Gleaves's application for SSI benefits. (R. 17–29). He held that Gleaves "has not been under a disability, as defined in the [Act], since May 16, 2016, the date the application was filed." (R. 29).

ALJ Hogan followed the five-step disability determination process. At step one, ALJ Hogan found that Gleaves had not engaged in substantial gainful activity since the application date. (R. 19). At step two, the ALJ found that Gleaves had the following severe physical and mental impairments: (1) lumbar degenerative disc disease; (2) obesity; (3) diabetes; (4) hypertension; (5) congestive heart failure; (6) panic disorder with agoraphobia; and (7) depression. (R. 19).

At step three, ALJ Hogan explained that he examined all of Gleaves's physical impairments. (R. 20). The ALJ specifically considered whether the following Listings were met: (1) 1.02(A) (major dysfunction of a joint with involvement of one major peripheral weight-bearing joint, resulting in inability to ambulate effectively); (2) 1.02(B) (major dysfunction of a joint with involvement of one major peripheral joint in each upper extremity, resulting in inability to perform fine and gross movements effectively); and (3) 1.04 (disorders of the spine). (R. 20); see 20 C.F.R. Appendix 1, Subpart P, Part 404 §§ 1.02(A)–(B), 1.04. ALJ Hogan found that the requisite criteria for each Listing were not met. (R. 20). Regarding Listings 1.02A and 1.02B, ALJ Hogan found that there was no evidence that Gleaves could not ambulate effectively or that the impairment resulted in an inability to "perform fine and gross movements effectively." (R. 20).

Regarding Listing 1.04, the ALJ found that the "radiological evidence d[id] not support [a finding] that a nerve root or the spinal cord ha[d] been compromised."  (R. 20).

ALJ Hogan also assessed all of Gleaves's mental impairments, focusing on Listings 12.04 (depressive, bipolar, and related disorders) and 12.06 (anxiety and obsessive-compulsive disorders), and considering whether the "[P]aragraph B" criteria ("[T]he mental impairments must result in at least one extreme or two marked limitations in a broad area of functioning which are:   understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing themselves.") had been satisfied.  (R. 20); see 20 C.F.R. Appendix 1, Subpart P, Part 404 §§ 12.04, 12.06.  ALJ Hogan found that Gleaves's impairments, "considered singly and in combination, do not meet or medically equal the criteria of" the Listings.  (R. 20).  Specifically, ALJ Hogan found that Gleaves was mildly limited in "understanding, remembering, or applying information"; moderately limited in "interacting with others"; mildly limited in "concentrating, persisting, or maintaining pace"; and moderately limited in "adapting or managing [him]self."  (R. 20–21).  ALJ Hogan further examined the evidence and concluded that the "objective medical evidence of record does not contain any medical source statements or opinion testimony from an acceptable medical source citing specific supporting evidence indicating that [Gleaves's] condition" meets or equals the Paragraph C criteria of Listings 12.04 or 12.06.  (R. 21).

ALJ Hogan assessed Gleaves's residual functional capacity as being able to perform light work with the certain limitations.  (R. 21).  ALJ Hogan stated that while Gleaves's "medically determinable impairments" could plausibly cause the symptoms he alleged, Gleaves's "statements concerning the intensity, persistence[,] and limiting effects of these symptoms

[were] not entirely consistent with the medical evidence and other evidence in the record[.]" (R. 22).  In this determination, ALJ Hogan also considered Gleaves's daily activities and earnings history, finding that the former suggested an ability to perform "light work activity with limited contact with others and limited stress in an unskilled work environment," while the latter, detailing a "minimal work history" even before the onset of symptoms, "erode[d] the probative weight of [Gleaves's] allegations." (R. 25–26).

Because Dr. Spivack's statements failed to describe any "vocationally relevant limitations," ALJ Hogan afforded them little weight. (R. 26).  ALJ Hogan also gave little weight to Dr. Spivack's mental residual functional capacity assessment, because the "marked to extreme limitations" detailed therein were belied by Gleaves's "documented improvement with medication management and consistent therapy[.]" (R. 26).  ALJ Hogan only granted some weight to Dr. Donning's statements regarding the activity limitations caused by the panic attacks, because they were "vague and without specific vocationally[-]relevant limitations." (R. 26).  Dr. Ravi's statements were given some weight to the extent that they supported ALJ Hogan's findings on limitations, and ALJ Hogan accepted the limitations regarding squatting and driving, because of Gleaves's "back condition and neuropathy." (R. 26–27).  Despite finding Dr. Aguiar's conclusion regarding Gleaves's heart failure "vague and ambiguous," ALJ Hogan afforded it weight "to the extent [that] it support[ed] a finding for a range of light work activity[.]" (R. 27).  Dr. Fujikawa's report regarding Gleaves's mental health limitations was afforded significant weight by ALJ Hogan, who found it to be "generally consistent with the treatment notes document[ing] stability with ongoing medication management and counseling therapy." (R. 27).  ALJ Hogan afforded no weight to the "Single Decision Maker's" assessment. (R. 27).  Finally, ALJ

Hogan afforded "great weight" to the statements given by the state agency psychological consultant, as the limitations described were "supported by the longitudinal medical evidence," reflecting "independence in activities of daily living as well as improvement with counseling and medication[] management to the point of reaching stability." (R. 27).

At step four, ALJ Hogan found that, based on Gleaves's limitations, age, education, work experience, residual functional capacity, and Marbury's testimony, Gleaves would be unable to perform his past relevant work as a custodian, but at step five, found that there were a significant number of jobs in the national economy that he could perform. (R. 28–29). As a result of his findings, ALJ Hogan concluded that Gleaves was not disabled as defined by the Act. (R. 29).

### 3.  The Appeals Council decision

On October 4, 2018, Gleaves filed a request for review with the Appeals Council. (R. 138). By letter dated June 17, 2019, the Appeals Council found that there was no basis for changing ALJ Hogan's decision and denied the request for review. (R. 1–3).

### III.   ANALYSIS

### A.  Standards for Benefits Eligibility

For purposes of SSI benefits, one is "disabled" within the meaning of the Act, and thus entitled to such benefits, when he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(3)(A). The Act also requires that the impairment be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial

gainful work which exists in the national economy."  42 U.S.C. § 1382c(3)(B).  In reviewing a claim

of disability, the Commissioner must consider:  "(1) objective medical facts; (2) diagnoses or

medical opinions based on those facts; (3) subjective evidence of pain and disability testified to

by claimant and other witnesses; and (4) the claimant's background, age, and experience."

Williams ex rel. Williams v. Bowen, 859 F.2d 255, 259 (2d Cir. 1988); 20 C.F.R. § 416.927.

Under SSA regulations, disability is evaluated under the sequential five-step process set

forth in 20 C.F.R. § 404.1520(a)(4)(i)–(v).  The Second Circuit has described the process as follows:

> First, the Secretary considers whether the claimant is currently engaged in
> substantial gainful activity.  If not, the Secretary next considers whether the
> claimant has a "severe impairment" which significantly limits his physical or
> mental ability to do basic work activities.  If the claimant suffers such an
> impairment, the third inquiry is whether, based solely on the medical
> evidence, the claimant has an impairment which is listed in Appendix 1 of
> the regulations.  If the claimant has such an impairment, the Secretary will
> consider him disabled without considering vocational factors such as age,
> education, and work experience; the Secretary presumes that a claimant
> who is afflicted with a "listed" impairment is unable to perform substantial
> gainful activity.  Assuming the claimant does not have a listed impairment,
> the fourth inquiry is whether, despite the claimant's severe impairment, he
> has the residual functional capacity to perform his past work.  Finally, if the
> claimant is unable to perform his past work, the Secretary then determines
> whether there is other work which the Claimant could perform.

Bush v. Shalala, 94 F. 3d 40, 44–45 (2d Cir. 1996) (quoting Rivera v. Schweiker, 717 F.2d 719, 722

(2d Cir. 1983)).

For claims of mental impairments, the applicable regulations require the ALJ to use a

"special technique" to evaluate the claimed mental impairments.  See 20 C.F.R. § 416.920a(a).

At step two of the five-step procedure for evaluating disability, the ALJ must rate the degree of

functional limitation resulting from the claimant's mental impairment to determine whether it is

"severe."  See id. at § 416.920a(d)(1).  If the claimant's mental impairment is severe, then the ALJ

must determine whether the impairment "meets or is equivalent in severity to a listed mental disorder" in the Listings.  Id. at § 416.920a(d)(2).  If the claimant is found to have a severe impairment not in the Listings, then the ALJ must assess the claimant's residual functional capacity to determine whether the claimant can meet the mental demands of past relevant work in spite of the limiting effects of the claimant's impairment and, if not, whether the claimant can do other work, considering the claimant's remaining mental capacities reflected in terms of the claimant's occupational base, age, education, and work experience.  See id. at § 416.920a(d)(3).

At the first four steps, the claimant bears the burden of proof.  At the fifth step, the burden shifts to the Commissioner to demonstrate that there are jobs in the national economy that the claimant can perform.  See, e.g., Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009).  In meeting the burden of proof at the fifth step, the Commissioner can usually rely on the Medical-Vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, known as "the Grid." Zorilla v. Chater, 915 F. Supp. 662, 666–67 (S.D.N.Y. 1996).

**B.  Standard of Review**

Under Federal Rule of Civil Procedure 12(c), a party is entitled to judgment on the pleadings if he establishes that no material facts are in dispute and that he is entitled to judgment as a matter of law.  Burnette v. Carothers, 192 F.3d 52, 56 (2d Cir. 1999); Morcelo v. Barnhart, No. 01 Civ. 743 (RCC) (FM), 2003 WL 470541, at *4 (S.D.N.Y. Jan. 21, 2003).

The Act provides that the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  A court may set aside the Commissioner's decision denying SSI benefits if it is not supported by substantial evidence or was based on legal error.  Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009).  Judicial review,

therefore, involves two levels of inquiry.  First, the Court must decide whether the ALJ applied the correct legal standard.  Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Calvello v. Barnhart, No. 05 Civ. 4254 (SCR) (MDF), 2008 WL 4452359, at *8 (S.D.N.Y. Apr. 29, 2008).  Second, the Court must decide whether the ALJ's decision was supported by substantial evidence.  Id.  "In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  Longbardi v. Astrue, No. 07 Civ. 5952 (LAP), 2009 WL 50140, at *21 (S.D.N.Y. Jan. 7, 2009).  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008) (internal citations omitted).  The substantial evidence test applies not only to the factual findings, but also to the inferences and conclusions drawn from those facts.  See, e.g., Carballo ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 214 (S.D.N.Y. 1999).  In determining whether the administrative record contains evidence to support the denial of claims, the Court must consider the whole record, and weigh all evidence to ensure that the ALJ evaluated the claim fairly.  See, e.g., Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999).  The Commissioner, not the Court, resolves evidentiary conflicts and appraises the credibility of witnesses, including the claimant.  See, e.g., Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998).

Disability-benefits proceedings are non-adversarial in nature, and therefore, the ALJ has an affirmative obligation to develop a complete administrative record, even when the claimant is represented by counsel.  See Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 508–09 (2d Cir. 2009).  To this end, the ALJ must make "every reasonable effort" to help an applicant get medical reports

from her medical sources.  20 C.F.R. § 416.912(b).  Ultimately, "[t]he record as a whole must be complete and detailed enough to allow the ALJ to determine the claimant's residual functional capacity."  Casino-Ortiz v. Astrue, No. 06 Civ. 155 (DAB) (JCF), 2007 WL 2745704, at *7 (S.D.N.Y. Sept. 21, 2007).  When there are inconsistencies, gaps, or ambiguities in the record, the regulations give the ALJ options to collect evidence to resolve these issues, including re-contacting the treating physician, requesting additional records, arranging for a consultative examination, or seeking information from others.  20 C.F.R. § 416.920b.

The ALJ must also adequately explain his reasoning in making the findings on which his ultimate decision rests, and in doing so, he must address all pertinent evidence.  An ALJ's "'failure to acknowledge relevant evidence or to explain its implicit rejection is plain error.'"  Kuleszo v. Barnhart, 232 F. Supp. 2d 44, 57 (W.D.N.Y. 2002) (quoting Pagan v. Chater, 923 F. Supp. 547, 556 (S.D.N.Y. 1996)).

The Act authorizes a court, when reviewing decisions of the SSA, to order further proceedings:  "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g); Butts v. Barnhart, 388 F.3d 377, 382 (2d Cir. 2004).  If "'there are gaps in the administrative record or the ALJ has applied an improper legal standard,'" the court will remand the case for further development of the evidence or for more specific findings.  Rosa v. Callahan, 168 F.3d 72, 82–83 (2d Cir. 1999) (quoting Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)).  Remand is particularly appropriate where further findings or explanation will clarify the rationale for the ALJ's decision.  Pratts, 94 F.3d at 39.  If, however, the reviewing court concludes that an ALJ's determination to

deny benefits was not supported by substantial evidence, a remand solely for calculation of benefits may be appropriate.  See, e.g., Butts, 388 F.3d at 386 (discussing Curry v. Apfel, 209 F.3d 117, 124 (2d Cir. 2000)).

### C.  Evaluation of ALJ's Decision

Gleaves's only argument is that the ALJ's Decision was "not supported by substantial evidence in the record[] or was based on legal error."  (ECF No. 2 at 2).  Given his pro se status, the Court liberally construes his argument.  See McCloud v. Mayers, No. 03 Civ. 0236, 2005 WL 181649, at *1 (2d Cir. Jan. 25, 2005) ("This Court construes the papers of pro se litigants liberally."); Massie v. Metro. Museum of Art, 651 F. Supp. 2d 88, 93 (S.D.N.Y. 2009) (noting that courts in the Second Circuit "apply[] a more flexible standard" to pro se submissions).  Nevertheless, the Court finds that the ALJ's Decision applied the correct legal standards and was supported by substantial evidence.

#### 1.  The ALJ applied the correct legal standards and his decision was supported by substantial evidence in the record

In concluding that Gleaves was not disabled within the meaning of the Act, the ALJ correctly evaluated Gleaves's claims pursuant to the five-step sequential evaluation process. (R. 17–29; see supra Section I.C.2); see Bush, 94 F. 3d at 44–45.

With respect to Gleaves's mental impairments, the ALJ used the requisite "special technique" to evaluate the claimed mental impairments.  (R. 20–21); see 20 C.F.R. § 416.920a(a).  ALJ Hogan appropriately rated the degree of functional limitation resulting from Gleaves's mental impairments to determine their severity, concluding that none were severe enough singly or in combination to meet a Listing.  See id.; see 20 C.F.R § 416.920a(d)(1).

In making his determination regarding Gleaves's mental impairments, ALJ Hogan also performed the requisite analyses under Paragraphs B and C of the respective Listings, appropriately considering and explaining the weight given to the evidence from the record. (R. 20–21).  Pursuant to Paragraph B, ALJ Hogan analyzed Gleaves's ability to understand, remember, apply information, interact with others, concentrate, persist, maintain pace, adapt, and manage himself.  (Id.)  Pursuant to Paragraph C, the ALJ considered the objective medical evidence as required and concluded that such evidence in the record did not support a finding that Gleaves's mental impairments met the Listings.  (R. 21).

ALJ Hogan carefully reviewed the objective medical records and medical opinion evidence and supported his findings with detailed discussion and citations to the record.  In his RFC assessment, ALJ Hogan carefully considered Gleaves's limitations.  (R. 21–28)

As required, this Court also reviewed the entire record, considered the evidence, and now concludes that substantial evidence supports the ALJ's Decision.  Thus, the ALJ's findings are conclusive.  See 42 U.S.C. § 405(g) (Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive."); Longbardi, 2009 WL 50140, at *21 ("In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight.").

Although, Dr. Spivack found that Gleaves had some marked, some extreme, and some moderate limitations relative to his mental impairments (R. 544–45), the record is replete with objective medical evidence and opinions that support the ALJ's RFC findings regarding Gleaves's physical and mental impairments.

Regarding Gleaves's physical impairments, for example, his records overtime generally show intact strength, full muscle strength, intact motor functioning and sensation, normal gait, unremarkable examination results, mild degeneration in his spine, no cardiac issues, and controlled hypertension.  (R. 22, 27–28, 305, 333–34, 338, 381–82, 393–94, 398, 408, 414–15, 420–21, 424, 426, 430, 437–38, 441–42, 478, 529).   Gleaves himself reported that his hypertension and congestive heart failure were asymptomatic, stable, with no acute changes, and his diabetes was stable.  (R. 379–80).

Regarding Gleaves's mental impairments, the ALJ adequately included in his analysis the information presented in Gleaves's mental health history, including the need for simple, routine tasks, only occasional interactions with others, and no interaction with the general public.  (R. 21, 24–28).  As analyzed by the ALJ, Dr. Spivack's conclusions of moderate and extreme limitations are mitigated by Gleaves's confirmation that he had decreased social anxiety and isolation; and could take walks in crowded places, engage in interstate travel, and attend events.  (R. 28, 464, 477–78, 491, 493–94).  In addition, his examinations frequently revealed that he was in a good mood, had fair insight and judgment, was logical, organized, coherent, had rational thought processes, and denied suicidal or homicidal ideation.  (R. 478, 492, 495, 499).

In addition, Gleaves's daily activities support the ALJ's findings about his physical and mental impairments.  Gleaves testified and repeatedly told medical professionals that he could take care of himself and even socialized with friends.  (R. 25–26, 380, 388).

The Court is satisfied that the ALJ's Decision is supported by substantial evidence in the record, such that a remand is not appropriate.

## IV.   **CONCLUSION**

For the reasons set forth above, the Motion is GRANTED.  The Clerk of Court is respectfully directed to close ECF No. 28, close this case, and mail a copy of this Order to Gleaves at the address below.

Dated:       New York, New York
             August 21, 2020

                                               SO ORDERED

                                               _____
                                               SARAH L. CAVE
                                               United States Magistrate Judge

Mail To:      Reginald Gleaves
              148 West 141st Street
              Apt. 3A
              New York, NY 10030